BEATRICE G. ROSS, administratrix, *vs.* LILLIAN G. ROSS
                   & another.

Norfolk.   October 9, 1952. — January 7, 1953.

Present: QUA, C.J., RONAN, WILKINS, SPALDING, & COUNIHAN, JJ.

*Gift.   Evidence,* Cumulative.   *Error,* Whether error harmful.

In a suit in equity by an administratrix against the decedent's sister to
   recover for his estate an amount which he had deposited in a joint
   bank account in the names of himself and his sister, payable "to either
   or the survivor," immediately after he and his wife separated and
   which his sister later withdrew at his request and redeposited in her
   name or in her name as trustee for him, evidence reported justified
   findings by the trial judge that there "was no intent on the part of
   . . . [the decedent] to make a gift" of the "deposit or of any interest
   therein" to his sister and that she "knew and believed" that the funds
   were his "sole property" and "did not act in good faith and intended
   with . . . [him] to defraud . . . [his] wife and family from reaching
   . . . [his] assets"; and a decree in favor of the administratrix was
   affirmed.
The admission of certain evidence subject to respondents' exceptions at
   the hearing of a petition, if error, was not prejudicial where the evidence
   added little or nothing to testimony previously admitted without
   objection. [648–649]

PETITION, filed in the Probate Court for the county of
Norfolk on May 24, 1951.

The case was heard by *Reynolds,* J.

*Francis D. Branca,* for the respondent Lillian G. Ross.

*Herbert A. Baker, (John S. Dennehy* with him,) for the
petitioner.

SPALDING, J.   This petition in equity is brought to re-
cover assets alleged to belong to the estate of John D.
Ross, hereinafter sometimes called Ross.   The petitioner
is Ross's widow and the administratrix of his estate.   The
respondents are Lillian G. and Tena B. Ross, sister and
mother, respectively, of Ross.   From a decree favorable to
the petitioner the respondent Lillian G. Ross appealed.
The judge found the material facts, and the evidence is
reported.

The following is a summary of the facts found by the
judge: The petitioner and Ross were married in this Com-
monwealth in 1929.   In 1933 they moved to Maine, where
they resided for about ten years.   Out of their joint earnings
(the petitioner being employed as a nurse) they acquired a
home, title to which was taken in the petitioner's name.   In
1943 they moved to Westwood in this Commonwealth.   In
1944 the house in Maine was sold and the net proceeds of
the sale, $3,500.04, were eventually deposited in their joint
names in a bank in Norwood.   Two children, a son and a
daughter, were born of the marriage, and their ages at the
time of the hearing below were twenty-one and eighteen,
respectively.   In the summer of 1949 discord developed
between the petitioner and her husband, and she left him
in August.   The separation lasted until December, 1949.
On January 4, 1951, the petitioner again left her husband
and never lived with him thereafter.   This separation was
"occasioned by . . . [his] treatment of . . . [the peti-
tioner] and [by] his failure to support his family."

On September 8, 1949, which was about three weeks after
the beginning of the first separation, Ross visited the bank
in Norwood in which he and his wife had a joint account
and withdrew the entire balance, and redeposited it there in
his own name.   On January 4, 1951, when the second sepa-
ration occurred, Ross, accompanied by one Aldrich, a
friend, visited three banks.   One was the bank in Norwood,
just referred to, and the other two were in Dedham.   He
told Aldrich that he was going to withdraw all of the funds
in his savings accounts.   From the Norwood bank he with-

drew the entire balance, $701.81. When he came out of the bank Ross showed the cash to Aldrich, and said that his wife and children, whom he characterized in words of opprobrium, would "never lay their hands on it." Ross then went to the two banks in Dedham, in each of which he had an account standing in his own name. In one he made a small deposit. From the other he withdrew the balance on deposit ($3,544.19) which was paid to him by check. Ross then told Aldrich that he was going to his sister's apartment in Roxbury where he had hidden $3,200. During that day, Ross, who had on prior occasions discussed with Aldrich the possibility of going west together on a business venture, renewed the discussion and offered to invest $10,000 if Aldrich would go in with him. Aldrich rejected the proposal.

Ross then went to the apartment of his sister Lillian (one of the respondents here) who at that time was at home and ill. Lillian lived with her mother, the respondent Tena B. Ross, who was also at home when Ross arrived. Ross told them of the withdrawals which he had just made. Early in the afternoon he went to the Eliot Savings Bank in Boston, where he opened a joint account in the names of himself and Lillian, payable "to either or the survivor." The amount deposited was $5,044.19 and was made up of $1,500 in cash and the check of the Dedham bank for $3,544.19. Later that day Ross returned with a signature card which Lillian executed. The pass book of the account was left with her. "No part of the deposit belonged to Lillian or her mother." Both knew that Ross and his wife were having domestic difficulties and that they had quarreled that morning. "There was no intent on the part of . . . [Ross] to make a gift to Lillian of the . . . [cash or check which went into the joint account]. He had no intent to make a gift to Lillian of the Eliot Savings Bank deposit or of any interest therein. I find that the respondent Lillian G. Ross did not act in good faith and intended with her brother to defraud the intestate's wife and family from reaching . . . [his] assets. The mother . . . participated

in the fraud." On three occasions during the next few months Ross obtained the pass book from his sister for the purpose of making two deposits and a withdrawal in relatively small amounts. The withdrawal was for his personal use.

On January 12, 1951, Ross's wife instituted divorce proceedings. On April 6, 1951, she signed a criminal complaint charging him with nonsupport. Beginning in the early part of February Ross resided with his married sister in Connecticut. He came to Westwood on April 11, 1951, but, upon learning that he was wanted by the police, hurriedly returned to Connecticut. His residence in Connecticut was for the deliberate purpose of evading the service of process here.

On April 16, 1951, Ross telephoned Lillian from Connecticut and requested her to withdraw the entire sum on deposit in the Eliot Savings Bank and to redeposit it in her own name. About a week later Lillian withdrew the sum of $5,214.83 from the Eliot Savings Bank and redeposited it in two new accounts in the Boston Penny Savings bank. One, in the amount of $5,000, was opened in her name; the other, consisting of $214.83, was opened in her name as trustee for Ross, upon the advice of an officer of the bank. When Lillian withdrew these funds she "knew and believed that . . . [they were] the sole property of her brother . . . and . . . she was still conspiring with him to keep the . . . assets concealed and secreted from his family."

On May 8, 1951, while visiting Lillian, Ross was arrested and brought into court on the nonsupport charge, and the case was continued until May 14, 1951. On the following day he committed suicide.

Following the death of Ross the petitioner on May 15, 1951, through her son, demanded of Lillian, without success, the sums which had been turned over to her by Ross. Lillian's position is that she became the owner of them on January 4, 1951, by reason of a gift from Ross. Concerning this contention the judge found that the "thought of a gift

. . . did not enter the brain of Lillian until after May 15, 1951"; and that "no such gift . . . as she now contends" was ever made to her.

The question whether there was a gift was one of fact. The judge stated that the "story told by the two respondents was not credible" and that he "could place no reliance on the testimony of other material witnesses called by them." It would be enough to say, as we do, that the findings of the judge were not plainly wrong. But we go further and say that they were eminently justified. Even from the printed record much of the testimony of the respondents and their supporting witnesses leaves a distinct impression of evasiveness ,and improbability. From the findings of the judge it is plain that the purported gift was a sham and was made in pursuance of a thinly veiled scheme to place the property beyond the reach of the petitioner and her children. The form of the deposit as between parties other than the bank, of course, did not settle the matter and the lack of donative intent could be shown by the attendant circumstances. *Castle* v. *Wightman,* 303 Mass. 74, 76–77. *Ball* v. *Forbes,* 314 Mass. 200, 203–204. *Kittredge* v. *Manning,* 317 Mass. 689, 692–693.

Some questions of evidence remain. The petitioner introduced the libel filed on January 12, 1951, in the divorce proceedings brought by her against Ross. She also introduced the complaint signed by her in the nonsupport case dated April 6, 1951; the summons issued thereon returnable April 11 showing the officer's return of service at Ross's last and usual place of abode; and a warrant for his arrest issued subsequently. Evidence was introduced through one Aldrich, called by the petitioner, to the effect that Ross had told him in the latter part of March that the "police were trying to make service on him" in the divorce proceedings brought by his wife. All of this evidence was admitted subject to the respondents' exceptions.

It becomes unnecessary to consider whether this evidence was admissible, for we are satisfied that it was not prejudicial. It appears that Aldrich, prior to giving the testi-

mony just referred to, had testified without objection that Ross had told him that "he had to keep more or less out of the town of Westwood" or if he came there "he would prefer to come in the evening because he knew the police . . . had a bunch of papers they wanted to serve on him." Aldrich further testified that late in March, 1951 (later corrected to April 11), he met Ross at a garage in Westwood and told him that police officers had just been there and inquired as to his (Ross's) whereabouts because they had "a bunch of papers to serve on him"; that he said to Ross, "John, they are going to get you. Why don't you go down to the station and turn yourself in and accept service? You can't keep this strung out a long time. You might as well"; and that Ross replied, "I will like hell. They can chase me all over the country. I am going back to Maine as fast as I can go." The evidence objected to added little or nothing to this and was merely cumulative. It is difficult to see how it could have "injuriously affected the substantial rights" of the respondents even if, as we do not decide, it was inadmissible. G. L. (Ter. Ed.) c. 231, § 132. *Bendett* v. *Bendett*, 315 Mass. 59, 65–66.

*Decree affirmed.*